J-A18016-18

2018 PA Super 346

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
TRISTAN STAHLEY   :
  :
Appellant   :   No. 3109 EDA 2017

Appeal from the PCRA Order August 28, 2017
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0005026-2013

BEFORE:   STABILE, J., STEVENS*, P.J.E., and STRASSBURGER**, J.

OPINION BY STEVENS, P.J.E.:         **FILED DECEMBER 19, 2018**

Appellant, Tristan Stahley, appeals from the order entered in the Court of Common Pleas of Montgomery County dismissing his petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 1941-1946. Herein, he contends the PCRA court erroneously denied his ineffective assistance of trial counsel claims and his legality of sentencing claim based on the Pennsylvania Supreme Court's recent decision in **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017) ("**Batts II**") (devising procedural safeguards to ensure proper implementation of **Miller v. Alabama**, 567 U.S. 460 (2012) in the consideration of life without parole sentences for juvenile offenders). We affirm.

The PCRA court aptly provides a comprehensive recitation of relevant facts and procedural history, as follows:

_____
\*   Former Justice specially assigned to the Superior Court.
\*\* Retired Senior Judge assigned to the Superior Court.

[Appellant's stipulated non-jury trial] established that on May 25, 2013, Appellant murdered Julianne Siller, who was 17 years-old. N.T. (trial), 9/29/14, at 13. Appellant was 16 years of age at the time of the murder. *Id.*

On the night of the incident, a dispatch came into the State Police of a stabbing in Palmer Park. *Id.* The two responding troopers went to Appellant's house, where they saw Appellant and his father on the ground fighting. *Id.* After separating the two, Appellant [made] a statement that he stabbed his girlfriend because she broke up with him and that he thought she would hook up with other people. *Id*.

The troopers took Appellant to Palmer Park and he directed them to the trail where [ ] Ms. Siller was [lying]. *Id*. There was blood on the trail and a trail of blood [leading] into the woods of the park. *Id.* Appellant's DNA was found at the scene. There was DNA on the knife used to kill Ms. Siller. *Id*. at 13-14. The handle of the knife contained Appellant's DNA and on the blade was [DNA belonging to] Ms. Siller. *Id*. at 14. In addition, one of the troopers found blood in the bathroom at Palmer Park that was genetically matched to Appellant. *Id*.

At the scene of the crime the troopers found Ms. Siller's jean jacket with a stab wound in it, a shirt that had blood on it, stab wounds on Ms. Siller, and the murder weapon, 10 feet from Ms. Siller's body. *Id*.

Trooper Barry Bertolet took custody of Appellant at the scene when Ms. Siller's body was found. *Id*. Trooper Bertolet went through the ***Miranda***[1] warnings form with Appellant while in the presence of his mother. *Id*. Appellant and his mother both signed the form, indicating they understood all of his rights. *Id*.

Appellant gave the troopers a statement. During this statement Appellant told the trooper that he was sober and that he understood what was going on. *Id*. In the statement, Appellant gave a rendition of the facts, wherein he said that he and Ms. Siller were in a relationship, but they were on-again, off-again and that she would always come back. *Id*. at 15. Additionally, he told the troopers that they got into a fight that night about her going out

---

[1] ***Miranda v. Arizona***, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and that he stabbed her in the neck with the knife. *Id*. The trooper asked Appellant, "When did you make the decision in your mind?" [Appellant] replied, "About two seconds before I did it." *Id*.

An autopsy was performed on Ms. Siller and the cause of death was determined to be multiple stab and cutting wounds, and the manner of death was homicide. *Id*. Ms. Siller suffered over 75 stab wounds to her body, including 27 to her head and neck and 45 to her torso and shoulders. *Id*.

At the conclusion of trial, [the trial court] found Appellant guilty beyond a reasonable doubt of murder in the first degree. *Id*. at 19.

On December 17, 2014, a sentencing hearing was held. After considering the ***Miller v. Alabama***, [567 U.S. 460 (2012)] factors as codified in 18 Pa.C.S.A. § 1102.1 and stating its reasons on the record, including the finding of irreparable corruption, [the trial court] imposed a sentence of life imprisonment without parole. No appeal was filed.

On December 22, 2015, Appellant filed a *pro se* PCRA petition. Counsel was appointed, and after multiple extensions of time, PCRA counsel filed an Amended PCRA Petition on February 13, 2017.

A PCRA Hearing was conducted on July 25, 2017. Appellant's trial counsel, Timothy Barton, a seasoned defense attorney of 29 years, provided credible testimony as follows.

Attorney Barton's involvement in this case began when he had been privately retained by the Stahleys. *Id*. at 4. In his initial meeting with the Stahley family, he discussed the scope and nature of his representation and he also interviewed Mr. and Mrs. Stahley regarding anything they might know about the incident. N.T., (PCRA hearing), 7/25/17, at 5.

Both Mr. and Mrs. Stahley had been present the night that Appellant was arrested. *Id*. Mrs. Stahley accompanied Appellant to the police station and was present during the custodial interrogation when Appellant, then a minor, gave a statement to police. *Id*. at 5-6.

- 3 -

Attorney Barton estimated that he met with Appellant over a dozen times, "if not more." *Id*. at 6. He met with him on a weekly basis for a period of time at Montgomery County Correctional Facility. *Id*. In addition, Attorney Barton testified that he met with Appellant's parents "[o]ften" and were in frequent contact, although he was unable to estimate on how many occasions. *Id*. at 6-7.

Since Appellant admitted to the murder in his statement to police, Attorney Barton's initial strategy was to focus on whether at the time of the crime Appellant could have formed a specific intent to kill and what degree of guilt it might be. *Id*. at 7.

Prior to trial, Attorney Barton in part prepared a decertification motion, for which he retained two psychiatrists, Dr. John O'Brien and Dr. Steven Samuel for the purpose of interviewing Appellant to ascertain what defenses there might be at trial. *Id*. at 25-27. In part, Attorney Barton wanted to use Dr. Samuel's report to show the [District Attorney] that there should be some sort of plea negotiations. *Id*. at 27. In addition, he had several conversations with the assigned Assistant District Attorney, Jeremy Lupo, who had been assigned the case and with the then District Attorney, Risa Ferman, about possible resolutions. *Id*. at 8. ADA Lupo informally suggested that if Appellant were to plead guilty, the Commonwealth would recommend a sentence of 40-80 years' imprisonment. *Id*. at 28. Attorney Barton testified that Appellant was not interested in that deal in large part because he believed that in 40 years his mom and/or dad would be deceased. *Id*. That was very important to Appellant, the hope that he would be able to unify with his parents. *Id*.

Attorney Barton testified that in his conversations with Appellant, they spoke about whether he actually formed the intent to kill. *Id*. at 9. Attorney Barton also testified that Appellant had described his state of mind the evening of the murder, telling him that he intended to kill the victim. *Id*. at 32. Appellant told Attorney Barton this at various meetings at the Montgomery County Correctional Facility. Specifically, Appellant told Attorney Barton that it was not his intent to kill Miss Siller when they were home or left the home or went to the park, but at some point while at the park he decided to kill her. *Id*.

Attorney Barton stated that he had reviewed discovery, which included a property receipt for a search that was executed at the

Stahleys' home. *Id*. at 9-10. In that property receipt was a "nearly empty bottle of raspberry vodka." *Id*. at 11.

Attorney Barton also reviewed various witness statement, and in particular the statement of Todd Evans, a paramedic who treated Appellant the evening of the murder, wherein Appellant told Mr. Evans that he was under the influence of alcohol. *Id*. at 12. Appellant had also told police in his statement that he had been under the influence of alcohol. *Id*.

According to Attorney Barton, he had also received an expert report from Dr. O'Brien which opined "It is my opinion that [Appellant's] records and the psychological testing performed by Dr. Samuel reflect him to have been a troubled adolescent with a combination of both psychiatric symptoms and characterological difficulties which rendered him susceptible to the disinhibiting effects of alcohol on the night of the offense." *Id*. at 13, 15. The report concluded "It is my opinion that as a result of his psychiatric, psychological and characterological impairments, and his degree of intoxication at the time of the offense, [Appellant] was not able to premeditate, deliberate and formulate the intent to kill Julianne Siller, notwithstanding his response to police questioning about the timing of his 'decision' to kill Julianne Siller at the time of the offense." *Id*. at 17.

Attorney Barton had this report prior to the trial; however, he did not call Dr. O'Brien to testify at the time of trial or at the suppression hearing. *Id*. at 17-18. On cross-examination, Attorney Barton explained that Dr. O'Brien had been privately retained by the Stahley family for an opinion regarding Appellant's ability to form the specific intent to kill, in anticipation of him testifying at a jury trial. *Id*. at 29.

At some point, Attorney Barton had concerns about Dr. O'Brien's opinion. *Id*. at 30. He elaborated that in speaking with Dr. O'Brien after the Commonwealth had an expert examine Appellant and prepare a report, and some of the statements Appellant made after Dr. O'Brien's report was prepared, that Dr. O'Brien's opinion was weakened, if not invalidated. *Id*. at 30. More specifically, Attorney Barton had the expert report prepared by Dr. Barbara Ziv, the expert retained by the Commonwealth to examine Appellant. *Id*. at 31. He reviewed the report himself and with Appellant at the prison. *Id*.

At the PCRA hearing, Attorney Barton detailed the events on September 29, 2014, the day of the scheduled trial, that occurred causing Appellant's decision to proceed with a stipulated bench trial instead of a jury trial. That morning Attorney Barton was prepared to proceed to a jury trial, and would have presented Dr. O'Brien, Mrs. Stahley and possibly Appellant along with an intoxication defense. *Id*. at 19, 21-22. Mrs. Stahley requested that she speak to her son. *Id*. at 19. Both Mr. and Mrs. Stahley were permitted to meet with Appellant in the robing room, where there was a conversation mainly between Mrs. Stahley and Appellant about whether he should proceed with a jury trial or plead guilty. *Id*.

Mrs. Stahley and Attorney Barton had had many conversations about the merits of the Commonwealth's case, the defenses, and the options. *Id*. Specifically, Attorney Barton explained the defense of intoxication. *Id*. He explained that to present a defense of diminished capacity by intoxication, [the intoxication] had to be so overwhelming as to render him unable to process what was going on. *Id*. at 20. Attorney Barton actually copied the law on first and third degree murder and diminished capacity and reviewed them with both Appellant and his mother. *Id*. Attorney Barton also discussed Dr. O'Brien's report with them. *Id*. at 21.

Additionally, Attorney Barton testified that they discussed jury trial, waiver of a jury trial, and what each entailed. *Id*. They discussed "degree of guilt" hearings. *Id*. Attorney Barton elaborated that whether to proceed to a stipulated non-jury trial was an evolving conversation. He stated that the consideration had been an ongoing conversation for weeks or months. As Attorney Barton explained it, "it was all part of the fabric of our conversations during probably the later parts of my representations." *Id*. at 33.

The Commonwealth asked trial counsel why . . . Appellant proceed[ed] to a stipulated non-jury trial if Appellant elected to plead guilty. *Id*. Attorney Barton recollected that [the trial court] did not want to accept a guilty plea because that would allow Appellant to at least attempt to file a motion to withdraw the guilty plea within ten days and, therefore, a stipulated non-jury trial was elected to go forward. *Id*. at 33-34. Attorney Baron fully advised Appellant that it would be a stipulated non-jury trial instead of a guilty plea. He also advised Appellant that it would be the

functional equivalent of a guilty plea, but that he had to be absolutely certain he wanted to proceed in that manner because unlike a guilty plea, Appellant would not have the option to file a motion to withdraw [a] guilty plea. *Id*. at 34.

It was Attorney Barton's opinion that the advantage to Appellant in waiving a jury trial and essentially pleading guilty wold be that the sentencing court would take this into consideration when fashioning a sentence to impose, that Appellant showed some remorse, took some accountability and spared the Siller's a prolonged jury trial with graphic testimony and exhibits. *Id*. at 35. He believed these factors would be considered at the time of sentencing. *Id*.

Regarding intoxication as an issue in this case, Attorney Barton did file a suppression motion[.] [I]n part included therein was the argument that the statements that Appellant gave to police were not knowing and voluntary due to his level of intoxication. *Id*. at 35-36. There were several statements that Appellant made to troopers who responded to the original scene, those made when Appellant voluntarily accompanied the troopers to the park and those he made during his custodial interrogation. *Id*. at 36. The trooper asked some questions to elicit some response about his condition, including his level of intoxication. *Id*. at 37. Mrs. Stahley was present during this questioning and signed off on each answer. *Id*.

There were audio/video recordings that cut against an intoxication defense. Id. Specifically, there was a video directing the troopers back to the park and you could hear Appellant in the audio being conversational with the troopers, directing them through the park, talking to them about certain things that happened. From Attorney Barton's perspective, he believed this evidence, which to him showed that Appellant did not seem intoxicated, would be well below the standard required to suppress a statement due to involuntary intoxication. *Id*. at 38. He also believed that this evidence also undercut an intoxication defense at trial. *Id*.

Next to testify on behalf of Appellant was Todd Evans, who was employed by Skippack Emergency Medical Services as a paramedic and responded to the scene at Palmer Park. *Id*. at 47-48. Mr. Evans provided emergency help to Appellant for some lacerations to his legs and an abrasion on his forehead. id. at

48. While transporting Appellant to the hospital, Mr. Evans observed that Appellant had different mood swings. *Id*. One minute he would be calm and able to talk, but then he would break down crying and sobbing uncontrollably and verbalizing inappropriately. *Id*. Under questioning by PCRA counsel he said that Appellant's behavior "possibly" indicated intoxication. *Id*. at 49. However, Mr. Evans was able to communicate with Appellant. *Id.* at 50. He was able to ask Appellant questions, and Appellant was able to provide some answers. *Id*. at 51. Mr. Evans testified Appellant seemed emotionally upset. Additionally, Mr. Evans stated that Appellant was able to walk on his own. *Id*. at 51.

Next to testify was Heather Stahley, Appellant's mother. According to Mrs. Stahley, she relayed to Attorney Barton that her son told her that he had been drinking and taken Molly the night of the incident. Id. at 54. It was Mrs. Stahley's testimony that Attorney Barton had advised her that voluntary intoxication is not a defense to murder. *Id*.

Mrs. Stahley testified that on the morning of the scheduled trial, Attorney Barton spoke to her about the possibility of pleading open or a stipulated non-jury trial, explaining that Attorney Barton suggested it because he believed it was the best chance to obtain a more favorable sentence. *Id*. at 59. Mrs. Stahley relayed this information to her son in the robing room. *Id*. [Concerning] the degrees of murder, Attorney Barton had explained the difference between first degree and third degree murder. *Id*. at 61. He had also talked to Mrs. Stahley about calling Dr. O'Brien as a witness at trial. *Id*. Additionally, Mrs. Stahley could only recall that Attorney Barton had met with her son four or five times over the course of his representation. *Id*. at 62.

Upon cross-examination, Mrs. Stahley recollected that in the statement she gave to troopers the night of the murder she did not tell the troopers that Appellant was intoxicated. Mrs. Stahley was with her son on the day and night of the murder. According to her statement to the troopers, at around 2:00 p.m., Appellant went into her room wanting to go to Target where he bought a video game. *Id*. at 64-65. Appellant knew that his mom was upset about a fight she had with a friend, so he bought her favorite drink from Starbucks to cheer her up. *Id*. at 65. After Target, Mrs. Stahley and her son went to Rita's for water ice. *Id*. at 65-66. The two of them went home afterwards and watched

TV. *Id*. Appellant was still trying to cheer up his mom. *Id*. at 66. Mrs. Stahley admitted at the PCRA hearing that Appellant did not appear intoxicated during the time they spent together. *Id*. at 66.

At some point that evening, Appellant went upstairs to his room. Later around 7:00 p.m., he asked his mom to take him to Wawa. *Id*. at 67. Mrs. Stahley told the troopers in her statement that Appellant did not appear intoxicated between the time they got home from Rita's and went to Wawa. *Id*. at 68. After Wawa, Appellant spent some time in the living room, and later went up to his room again. *Id*. Around 8:20, Appellant went down and asked his mom to use her phone to call Julianne two times. *Id*. He then went up to his room with the phone. *Id*. Still, Appellant did not appeal intoxicated. *Id*. at 69.

About 10 to 15 minutes later after Appellant [returned his mother's phone to her], Ms. Siller came over her house. *Id*. Ms. Siller said, "hi," and went upstairs. *Id.* Mrs. Stahley heard bickering coming from upstairs and she went to check on them. *Id*. She asked them if they were okay, and they said they were fine. *Id*. at 69-70. Around 8:56 p.m., Mrs. Stahley spoke to her husband on the phone. *Id*. at 70. Ms. Siller and Appellant came downstairs around 9:01 p.m. *Id*. Mrs. Stahley saw them briefly, and she did not see any signs of intoxication in her son. *Id*.

Ms. Siller and Appellant went for a walk and sometime later Appellant returned to his home and asked his mom to go for a walk with him. id. Mrs. Stahley immediately knew that her son was crying. *Id*. at 71. She also noticed some blood or dirt on his legs, which Appellant explained away telling her he had fallen. Id. Mrs. Stahley tried to persuade her son to sit down and talk right there, but Appellant insisted they go for a walk. *Id*. at 71.

On their walk, Appellant told her that he and Ms. Siller broke up and that he stabbed her. *Id*. at 72. Appellant said he did not know yet whether he had killed her. *Id*. Appellant started crying and pulled out a knife from his pocket and threatened to kill himself. *Id*. at 73. Mrs. Stahley convinced her son to come back to the house with her. *Id*. When she got there she went inside and spoke to her husband. *Id*. Mr. Stahley came out to ask Appellant what was going on. *Id*. He confessed to his father that

he stabbed Ms. Siller and that she was on the trial. *Id*. At the PCRA hearing, Mrs. Stahley stated that although Appellant was upset and bawling she was still able to communicate with him. *Id*. at 73-74.

Mrs. Stahley also testified that she had told police in her statement that Appellant had been drinking and that she knew that because her husband smelled alcohol on Appellant. *Id*. at 74-75. The police officer asked her whether Appellant had been drinking alcohol at the home prior to the event. *Id*. at 75-76. She responded by saying, "Not that I'm aware of. I didn't see the water bottle before they started wrestling. No. I mean, he was fine all day. He seemed fine when they left." *Id*. at 76. At the PCRA hearing, upon examination, Mrs. Stahley admitted that she never told the police on the night of the murder that Appellant had been drinking and took Molly, despite the officer's question specifically inquiring as to whether Appellant had been drinking that night. *Id*. at 76-77.

Next, the Commonwealth cross-examined Mrs. Stahley on the formal statement that he son gave to police when police asked her son whether he was under the influence of anything that might impair his ability to understand. *Id*. at 77. Appellant denied this, saying he understood what was going on. *Id*. The trooper followed up asking Appellant whether he would consider himself to be sober, buzzed or drunk to which Appellant answered, "Sober." Mrs. Stahley initialed those answers and agreed with Appellant. *Id*.

The third witness presented by PCRA counsel was Brian Stahley, Appellant's father. On direct examination, Mr. Stahley testified that the night of the incident his son was inebriated. *Id*. at 86-87. He also testified that Attorney Barton told him that intoxication is not a defense to murder in Pennsylvania. *Id*. at 87-88. On cross-examination, Mr. Stahley admitted that he was not with Appellant all day and would not have known when he started drinking. *Id*. at 94.

Finally at the PCRA hearing, Appellant testified. He testified that on the night of the incident he had been drinking and took the drug Molly. *Id*. at 98. Appellant stated that he had been drinking since 4:00 or 5:00 in the afternoon and took Molly, a form of Ecstasy, at about 7:00 p.m. *Id*. at 99. In relevant part, Appellant stated that when he spoke to Attorney Barton he had informed

him that he had been drinking and doing drugs the evening of the murder. *Id*. at 102. Appellant related that Attorney Barton told him that intoxication is not a defense to murder. *Id*. Appellant also said that he only met with Attorney Barton five or six times. *Id*. at 103.

Further, Appellant told [the PCRA court] that he wanted to go to trial, and that he had told this to his attorney. *Id*. at 103. Appellant denied that Attorney Barton reviewed with him how jury selection would work, what the Commonwealth had to prove to find him guilty, that there are different degrees of homicide in Pennsylvania and what third degree murder or voluntary manslaughter means. *Id*. at 104-104. Appellant further testified that Attorney Barton told him that the only [possible way to avoid] a life sentence was to proceed with a stipulated non-jury trial. *Id*. at 105. Moreover, Appellant denied that Attorney Barton ever reviewed appellate options, despite having competed and signed a post-sentence rights form. *Id*. at 106.

After the defense concluded its case, the Commonwealth called Attorney Barton to testify as a rebuttal witness. *Id*. at 112. On rebuttal, Attorney Barton categorically denied advising Appellant, his mother or father that voluntary intoxication was not a defense to murder. *Id*. at 113. Additionally, he denied telling Appellant, his mother or his father that Appellant's only chance for a non-life sentence was a guilty plea or a stipulated non-jury trial. *Id*. at 113-114.

On August 23, 2017, PCRA counsel and the Commonwealth provided argument on the PCRA petition including the recent case of ***Commonwealth v. Batts***, 163 A.3d 410 (Pa. 2017) ("***Batts II***"). Relief was denied on August 28, 2017.

Trial Court Opinion, 11/15/17, at 1-15.

On appeal, Appellant presents the following issues for review:

I. **DID THE PCRA COURT ERRONEOUSLY DENY [APPELLANT'S INEFFECTIVENESS CLAIM, WHERE TRIAL COUNSEL FAILED TO INTRODUCE READILY AVAILABLE EVIDENCE, FROM BOTH LAY AND EXPERT WITNESSES, WHICH WOULD HAVE ESTABLISHED**

**[APPELLANT'S] INTOXICATION AT THE TIME OF THE CRIME AND WHICH WOULD HAVE SUPPORTED A DEFENSE OF VOLUNTARY-INTOXICATION/DIMINISHED-CAPACITY?**

**II. DID THE PCRA COURT ERRONEOUSLY DENY [APPELLANT'S] INEFFECTIVENESS CLAIM, WHERE TRIAL COUNSEL FAILED TO INTRODUCE READILY AVAILABLE EVIDENCE WHICH WOULD HAVE ESTABLISHED [APPELLANT'S] INTOXICATION AT THE TIME OF HIS POST-ARREST STATEMENT AND WHICH WOULD HAVE PROVIDED THE BASIS FOR A SUCCESSFUL MOTION TO SUPPRESS THE STATEMENT?**

**III. DID THE PCRA COURT ERRONEOUSLY DISMISS [APPELLANT'S] CHALLENGE TO THE LEGALITY OF HIS SENTENCE UNDER BATTS II?**

Appellant's brief, at 5.

Initially, we recite our standard of review:

This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. ***Commonwealth v. Halley***, 582 Pa. 164, 870 A.2d 795, 799 n. 2 (2005). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. ***Commonwealth v. Carr***, 768 A.2d 1164, 1166 (Pa.Super. 2001).

***Commonwealth v. Turetsky***, 925 A.2d 876, 879 (Pa.Super. 2007).

"To prevail on a claim alleging counsel's ineffectiveness, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness." ***Commonwealth v. Wallace***, 724 A.2d 916, 921 (Pa. 1999), *citing* ***Commonwealth v. Howard***, 645 A.2d 1300, 1304 (Pa. 1994) (other citation omitted). In order to meet the prejudice prong of the ineffectiveness standard, a defendant must show that there is a "'reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have

- 12 -

been different.'" **Commonwealth v. Kimball**, 724 A.2d 326, 331 (Pa. 1999), *quoting* **Strickland v. Washington**, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A "'[r]easonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.'" [**Kimball**], 724 A.2d at 331, *quoting* **Strickland**, 466 U.S. at 694, 104 S.Ct. 2052.

**Commonwealth v. Jones**, 811 A.2d 1057, 1060 (Pa.Super. 2002). Thus, when it is clear that a petitioner has failed to meet the prejudice prong of an ineffective assistance of counsel claim, the claim may be disposed of on that basis alone, without a determination of whether the first two prongs have been met. **Commonwealth v. Baker**, 880 A.2d 654, 656 (Pa.Super. 2005).

"We presume counsel is effective and place upon Appellant the burden of proving otherwise. Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." **Commonwealth v. Poplawski**, 852 A.2d 323, 327 (Pa.Super. 2004) (citations omitted). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. **Commonwealth v. Dennis**, 17 A.3d 297 (Pa. 2011).

In Appellant's first claim of ineffective assistance of counsel, he contends counsel ineffectively failed to present the testimony of his mother and Mr. Evans, the ambulance driver, during the suppression hearing to establish his intoxication at and around the time he provided his post-arrest statement to police. Such testimony, he maintains, would have undermined the credibility of the officers' claims that Appellant was not intoxicated when he gave his statement.

Regarding a claim of trial counsel ineffective assistance for failure to call witnesses, this Court has stated the following:

> In order to demonstrate counsel's ineffectiveness for failure to call a witness, a petitioner must prove that "the witness existed, the witness was ready and willing to testify, and the absence of the witness' testimony prejudiced petitioner and denied him a fair trial." [*Commonwealth v.*] *Johnson*, 27 A.3d [244,] 247 [(Pa.Super. 2011)] (internal citation omitted). In particular, when challenging trial counsel's failure to produce expert testimony, "the defendant must articulate what evidence was available and identify the witness who was willing to offer such evidence." *Commonwealth v. Bryant*, 855 A.2d 726, 745 (Pa. 2004) (internal citation omitted).

*Commonwealth v. Luster*, 71 A.3d 1029, 1047 (Pa.Super. 2013).

Here, the notes of testimony from Appellant's PCRA hearing belie his claim that Mrs. Stahley and Mr. Evans would have advanced his defense that he was intoxicated at the time he gave his statement to police. Specifically, Appellant's mother testified that he did not appear intoxicated during his time with her in the afternoon, and he seemed fine when he left the house with his girlfriend. "[H]e was fine all day. He seemed fine when they left," she testified. N.T. (PCRA) at 76-77.

As noted, Mrs. Stahley did testify Appellant was swaying when he returned home after the incident. Proximate to the time Appellant gave his statement to police, however, Mrs. Stahley told police that Appellant "knew what was going on," and she agreed with Appellant when he claimed to be "sober" when police asked him to give a formal statement. N.T. at 76-77.

Similarly, Mr. Evans indicated Appellant's emotional behavior after the event "possibly" indicated intoxication. His testimony, however, also included

his observations that Appellant communicated clearly during Mr. Evans' interactions with him and was able to walk on his own.

Finally, the record shows Attorney Barton zealously cross-examined the arresting officers and the interviewing trooper regarding their assertions that Appellant was sober when he gave his statement. N.T. (Suppression) at 41, 55, 95-97.

Given the content of Mrs. Stahley's and Mr. Burns' respective PCRA testimonies, we discern no prejudice from Attorney Barton's failure to call them to testify at Appellant's suppression hearing, as they would not have supported Appellant's theory of intoxication to the degree necessary to preclude admission of his statement. Accordingly, this ineffectiveness claim fails.

Next, Appellant contends Attorney Barton ineffectively failed to advise his parents and him properly regarding the defense of voluntary intoxication. Ordinarily, voluntary intoxication, or diminished capacity, is not a defense in Pennsylvania. 18 Pa.C.S.A. § 308. In cases of murder, however, a defendant may offer evidence of intoxication if it is "relevant to reduce murder from a higher degree to a lower degree of murder." *Id.* "Thus, a defendant asserting a diminished capacity defense admits responsibility for the underlying action, but contests the degree of culpability based upon his inability to formulate the requisite mental state." *Commonwealth v. Williams*, 980 A.2d 510, 527 (Pa. 2009).

According to Appellant and his parents, Attorney Barton asserted that voluntary intoxication is not a defense to first-degree murder. It follows that Attorney Barton never explained Pennsylvania decisional law holding that voluntary intoxication can negate the element of specific intent to kill required for a first-degree murder conviction, Appellant claims. For his part, Attorney Barton denied the Stahleys' claims in this regard.

The PCRA court determined Attorney Barton provided the credible testimony on this contested point. The court opines:

> Attorney Barton's credible testimony established that in his conversations with [Appellant], they spoke about whether he actually formed the intent to kill. Specifically, Attorney Barton explained the defense of intoxication. He explained that to present a defense of diminished capacity by intoxication, the intoxication had to be so overwhelming as to render him unable to process what was going on. Attorney Barton actually copied the law on first and third degree murder and diminished capacity and reviewed them with both [Appellant] and his mother. Accordingly, Attorney Barton cannot be found to be ineffective when he did, in fact, explain to [Appellant] and his parents the defense of voluntary intoxication.

Trial Court Opinion, at 24. As noted above, credibility determinations are within the sole province of the finder of fact, which in this case is the PCRA court. As there appears nothing in the record giving cause to disturb the court's findings of fact, Appellant's issue merits no relief.

Relatedly, Appellant also asserts Attorney Barton ineffectively proceeded to a stipulated non-jury trial instead of introducing evidence of Appellant's intoxication at the time of the crime. Evidence of his intoxication included: Appellant's post-arrest statement that he had drunk a half-gallon of

vodka at the time of the crime; the recovery of an empty vodka bottle from his bedroom; the testimony of Mr. Evans that Appellant was crying uncontrollably during his transport to the hospital; emergency room admission records containing a diagnosis of "alcohol intoxication"; Mrs. Stahley's testimony that Appellant was swaying when he returned from the park; Mr. Stahley's testimony that Appellant smelled of alcohol when he returned home; and the testimony of Dr. John O'Brien, a psychologist who concluded Appellant was unable to formulate the intent to kill Julianne Siller due to a number of factors including intoxication.

In response, the Commonwealth argues there was compelling evidence demonstrating Appellant's specific intent to kill:

> [Appellant] brought the victim to a secluded trail in a park, argued with her, and decided to kill her. He stabbed her first in the neck and then stabbed her over 75 more times. While he continued to stab her, he dragged her by her arms and hair into a wooded area. Hours later, he gave a detailed statement to police about the killing, in which he admitted that he intended to kill the victim and that he attempted to conceal her body. He also attempted to clean himself up after the murder.

Appellee's brief, at 19.

Most problematic for Appellant is that the evidence he presents to sustain his claim does not show he was "so intoxicated as to be overwhelmed to the point of losing his faculties and sensibilities and unable to formulate a specific intent to kill." *See Commonwealth v. Spotz*, 47 A.3d 63, 92-93 (2012) (citing *Commonwealth v. Hutchinson*, 25 A.3d 277 (Pa. 2011)) (citations omitted). In fact, the testimonies of those who saw Appellant

shortly before and shortly after the murder in question indicate he ably directed his actions and communicated his thoughts during all relevant times. Though he was emotional that evening, he nevertheless demonstrated no difficulty in leading investigators to the crime scene, describing to authorities the events leading up to his killing of Ms. Siller, or confirming that he formed the intent to kill just seconds before he stabbed her. Such evidence, therefore, refutes Appellant's claim that counsel's failure to make a voluntary intoxication presentation denied him a worthwhile guilt-phase defense. **See Spotz**, 47 A.3d at 94-95 (holding evidence of defendant's directed, intentional, goal-oriented activity at or near time of murder argues strongly against assertion that diminished capacity would have been viable trial defense had counsel only done further investigation).

In Appellant's remaining claim, he contends that his 2014 discretionary sentence of life without parole ("LWOP") imposed in conformity with **Miller v. Alabama**, 567 U.S. 460 (2012)[2] has since been rendered illegal by the Pennsylvania Supreme Court decision in **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017) ("**Batts II**"), which, Appellant maintains, applies retroactively to his collateral appeal. We review legality of sentencing claims "pursuant to

---

[2] On June 25, 2012, the United States Supreme Court held in **Miller v. Alabama** that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" **Id.**, 567 U.S. at 465.

a *de novo* standard and plenary scope of review." ***Batts II***, 163 A.3d at 434-36.

Initially, we note Appellant properly predicates his claim of an illegal sentence on the argument that ***Batts II*** presents a new rule of law that is retroactively applicable to his present PCRA claim. With respect to the interplay between the legality of sentence and retroactivity claims, jurisprudence of this Commonwealth has stated:

> A new rule of law does not automatically render final, pre-existing sentences illegal. A finding of illegality, concerning such sentences, may be premised on such a rule only to the degree that the new rule applies retrospectively. In other words, if the rule simply does not pertain to a particular conviction or sentence, it cannot operate to render that conviction or sentence illegal. (***Accord Welch v. United States***, ––– U.S. ––––, ––––, 136 S.Ct. 1257, 1264, 194 L.Ed.2d 387 (2016) (alluding to the "general bar on retroactivity" for new constitutional rules of a procedural dimension); ***Montgomery***, ––– U.S. at ––––, 136 S.Ct. at 730 ("[A] trial conducted under a procedure found to be unconstitutional in a later case does not, as a general matter, have the automatic consequence of invalidating a defendant's conviction or sentence.").

***Commonwealth v. Washington***, 142 A.3d 810, 814-815 (Pa. 2016).

"[N]ew constitutional procedural rules generally pertain to future cases and matters that are pending on direct review at the time of the rule's announcement." ***Id.***, at 815. Per ***Teague v. Lane***, 489 U.S. 288 (1989) (plurality) and its progeny, "[a] new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a 'watershed rule of criminal procedure' implicating the fundamental fairness and accuracy

of the criminal proceeding." **Commonwealth v. Ross**, 140 A.3d 55, 59 (Pa.Super. 2016) (citation and quotation omitted).[3]

**Batts II** involved a juvenile defendant who had originally received a mandatory LWOP sentence in 2007 for first-degree murder. While defendant Batts' direct appeal was pending, the United States Supreme Court issued its decision in **Miller**, invalidating mandatory LWOP sentences for juveniles and further indicating that discretionary LWOP sentences for juveniles should be a rarity. In **Commonwealth v. Batts**, 66 A.3d 286 (2013), ("**Batts I**"), the Pennsylvania Supreme Court directed that defendant Batts be resentenced in light of **Miller**. Upon resentencing, however, Batts received a discretionary

_____

[3] On the topic of choosing a test to decide retroactivity issues, this Court has said:

> While state courts are free to adopt more liberal standards in determining whether a decision is to be accorded full retroactivity, our Supreme Court has utilized the **Teague** test in examining retroactivity issues during state collateral review. **Commonwealth v. Bracey**, 986 A.2d 128 (Pa. 2009); **Commonwealth v. Hughes**, 865 A.2d 761 (Pa. 2004) (discussing **Teague** and whether a new rule was a watershed procedural rule); **see also Commonwealth v. Cunningham**, 622 Pa. 543, 81 A.3d 1, 8 (2013) ("This Court, however, generally has looked to the **Teague** doctrine in determining retroactivity of new federal constitutional rulings."). In **Cunningham**, the Court acknowledged that "this practice is subject to potential refinement" and "is not necessarily a natural model for retroactivity jurisprudence as applied at the state level." **Cunningham**, **supra** at 8. However, it ultimately applied the **Teague** formulation.

**Commonwealth v. Riggle**, 119 A.3d 1058, 1065 (Pa.Super. 2015).

LWOP sentence. This Court affirmed, and Batts appealed to the Pennsylvania Supreme Court, which granted his petition for allowance of appeal.

In reversing Batts' judgment of sentence and remanding, our Supreme Court devised a procedural scheme by which to implement *Miller*. Specifically, the scheme adopted a presumption against sentencing a juvenile to life in prison without the possibility of parole, and it imposed a burden upon the Commonwealth to prove a juvenile was incapable of rehabilitation beyond a reasonable doubt.

Importantly, the central concepts of *Miller* informed the *Batts II* procedures:

> Under *Miller* and *Montgomery* [*v. Louisiana*, ––– U.S. ––––, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016)], a sentencing court has no discretion to sentence a juvenile offender to life without parole unless it finds that the defendant is one of the "rare" and "uncommon" children possessing the above-stated characteristics, permitting its imposition. *Montgomery*, 136 S.Ct. at 726, 734; *Miller*, 567 U.S. at 479, 132 S.Ct. 2455; *see Graham*, 560 U.S. at 73, 130 S.Ct. 2011; *Roper*[ *v. Simmons*], 543 U.S. [551,] 572–73, 125 S.Ct. 1183, 161 L.Ed.2d 1 [(2005)]. A sentence of life in prison without the possibility of parole for a murder committed when the defendant was a juvenile is otherwise disproportionate and unconstitutional under the Eighth Amendment. *Montgomery*, 136 S.Ct. at 734, 735.
>
> Thus, in the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose. *See* [*Commonwealth v.*] *Vasquez*, 744 A.2d [1280,] 1282 [(Pa. 2000)]; [*Commonwealth v.*] *Shiffler*, 879 A.2d [185] 189 [(Pa. 2005)]; *In re M.W.*, 725 A.2d [729,] 731 [(Pa. 1999)].

*Batts II*, 163 A.3d at 435-36.

Our Supreme Court went on to conclude, therefore, that "a faithful application of the holding in **Miller**, as clarified in **Montgomery**, requires the creation of a presumption against sentencing a juvenile offender to life in prison without the possibility of parole."  **Batts II**, 163 A.3d at 452. Supporting this conclusion were the following reflections on **Miller**:

> [A]ny suggestion of placing the burden on the juvenile offender is belied by the central premise of **Roper**, **Graham**, **Miller** and **Montgomery**—that as a matter of law, juveniles are categorically less culpable than adults.  This central premise arises from "a conclusion firmly based upon the generally known results of wide human experience," which is that the vast majority of adolescents change as they age and, despite their involvement in illegal activity, do not "develop entrenched patterns of problem behavior." **Miller**, 567 U.S. at 471, 132 S.Ct. 2455 (referring to this conclusion as "common sense" and "what any parent knows") (citing **Roper**, 543 U.S. at 569–70, 125 S.Ct. 1183); **Watkins**, 173 A. at 648.  *The **Miller** Court reiterated the High Court's longstanding conclusion that the distinctive attributes of youth generally preclude a finding that a juvenile will forever be incorrigible, especially in light of the great difficulty even professional psychologists have in making that determination during a person's youth*.  **See Miller**, 567 U.S. at 472–73, 479–80, 132 S.Ct. 2455.
>
> **Miller**'s holding, "that life without parole is an excessive sentence for children whose crimes reflect transient immaturity," is a "substantive rule of constitutional law." **Montgomery**, 136 S.Ct. at 735.  This, according to **Montgomery**, means that only "the rarest of juvenile offenders" are eligible to receive a sentence of life without the possibility of parole. **Id.**
>
> Only in "exceptional circumstances" will life without the possibility of parole be a proportionate sentence for a juvenile.[ ] **Id.** at 736. Thus, there can be no doubt that pursuant to established Supreme Court precedent, the ultimate fact here (that an offender is capable of rehabilitation and that the crime was the result of transient immaturity) is connected to the basic fact (that the

offender is under the age of eighteen). *See Childs*, 142 A.3d at 830.

The United States Supreme Court expressly left it to the States to determine how the holding in *Miller* was to be implemented in state court proceedings. *Montgomery*, 136 S.Ct. at 735.

*Batts II*, 163 A.3d at 452 (emphasis added).

The Court further held the Commonwealth could rebut the presumption against the imposition of LWOP punishment with proof beyond a reasonable doubt that the juvenile falls under the exception to the general rule deeming juvenile offenders rehabilitable. *Id.* at 453. On this point, again, the Court drew upon the *Miller* decision:

The United States Supreme Court has clearly and unambiguously instructed that the decision that an offender is one of the rare and uncommon juveniles who may constitutionally receive a sentence of life without the possibility of parole must be made with near certainty. *The sentencer must determine that the offender is and "forever will be a danger to society," a finding that the High Court found to be in direct conflict with a child's inherent capacity to change.* *Miller*, 567 U.S. at 472, 132 S.Ct. 2455. To protect youthful offenders from erroneous decisions that foreclose their ability to ever be released from prison, the Supreme Court therefore held that a sentence of life without parole is disproportionate and illegal for a juvenile offender unless that defendant "exhibits such irretrievable depravity that rehabilitation is **impossible**." *Montgomery*, 136 S.Ct. at 733 (citing *Miller*, 567 U.S. at 479–80, 132 S.Ct. 2455) (emphasis added).

Pursuant to our consideration of the attendant due process concerns and the definitive language used by the Supreme Court, we conclude that to overcome the presumption against the imposition of a sentence of life without parole for a juvenile offender, the Commonwealth must prove that the juvenile is constitutionally eligible for the sentence beyond a reasonable doubt. In an effort to satisfy this burden, the Commonwealth may present evidence relating to the factors announced in *Miller* and the factors appearing in section 1102.1(d).

***Batts II***, 163 A.3d at 454–55 (emphasis added).

At the time ***Batts II*** was decided, Appellant's judgment of sentence was final, and his present collateral appeal was pending. Under the general rule of retroactivity cited *supra*, therefore, the new constitutional procedural rule announced in ***Batts II*** would not apply to Appellant's matter. Acknowledging this fact, Appellant argues ***Batts II*** qualifies as an exception to the general rule, as it announced either a substantive rule or, in the alternative, a "watershed rule of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding." ***Ross***, 140 A.3d at 59.

Differentiating substantive from procedural rules, the Pennsylvania Supreme Court has explained:

> [S]ubstantive rules are those that decriminalize conduct or prohibit punishment against a class of persons. ***See Montgomery****,* ––– U.S. at ––––, 136 S.Ct. at 729–30. Concomitantly, the Supreme Court has made clear that "rules that regulate only the *manner of determining* the defendant's culpability are procedural." ***Id.*** at ––––, 136 S.Ct. at 730 (quoting ***Schriro v. Summerlin***, 542 U.S. 348, 353, 124 S.Ct. 2519, 2523, 159 L.Ed.2d 442 (2004)) (emphasis in original).
>
> As to watershed rules, to date, the Supreme Court of the United States has discerned only one, arising out of the sweeping changes to the criminal justice system brought about by the conferral of the right to counsel upon indigent defendants charged with felonies in ***Gideon v. Wainwright***, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). ***See Beard v. Banks****,* 542 U.S. 406, 417, 124 S.Ct. 2504, 2513–14, 159 L.Ed.2d 494 (2004).

***Washington***, 142 A.3d at 813.

Specifically, Appellant offers alternative arguments for retroactive application of **Batts II** to his collateral appeal, asserting **Batts II** announced either a substantive rule of constitutional law or a watershed procedural rule:

> [Appellant] was never placed in the class of individuals eligible to receive life without parole. After [his] sentence was final, the Pennsylvania Supreme Court, in **Batts II**, corrected the prevailing jurisprudence in the state and adopted due process protections to ensure unconstitutional sentences were not imposed. The Court established that life without parole imposed in the absence of key due process protections was an illegal sentence beyond the state's authority to impose, creating a substantive rule that must be applied on collateral review [pursuant to **Teague**].
>
> . . .
>
> Alternatively, . . . [e]ven if **Batts II** is deemed procedural, it satisfies **Teague's** second exception as a "watershed rule[ ] of criminal procedure" [so as to require retroactive application]. . . . [**Batts II**] requir[es] a sentencing court to presume the attendant characteristics of youth and how they counsel against a life without parole sentence[, as is] necessary to avoid an unacceptable risk that the facts of the case will overpower the inherent mitigation of youth. . . . The presumption also constitutes a "bedrock procedural element" as it ensures the court conducts its analysis from the proper starting point, favoring parole-eligibility, and the presumption shifts the burden to the Commonwealth. "[A]ny suggestion of placing the burden on the juvenile offender is belied by the central premise of **Roper**, **Graham**, **Miller**, and **Montgomery**—that as a matter of law, juveniles are categorically less culpable than adults."
>
> Further, **Batts II** affirms the need for the Commonwealth to prove irreparable corruption [of the juvenile] beyond a reasonable doubt. . . . The Court selected the highest burden of proof due to its assessment that the "risk of an erroneous decision against the offender would result in the irrevocable loss of that liberty for the rest of his or her life," which outweighed the minimal risk of a parole-eligible sentence[, with parole likely to be denied if the juvenile later proved to be incapable of rehabilitation after all]. . . . Requiring a sentencer to shift from weighing various factors to

- 25 -

the Commonwealth having to prove irreparable corruption beyond a reasonable doubt creates a fundamentally different hearing.

. . .

[In the case *sub judice*,] [t]he lack of a presumption, failing to assign the burden of proof to the Commonwealth, and the absence of a beyond the reasonable doubt standard left the sentencing court in a position of merely weighing various factors against one another rather than answering **Miller**'s central question: whether the juvenile is capable of rehabilitation.

Appellant's brief at 26, 33, 34-35, 36.

The Commonwealth counters that **Batts II** expressed neither a substantive new rule nor a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. Instead, the Pennsylvania Supreme Court in **Batts II** identified that it was merely imposing new "procedural safeguards . . . required to ensure that life-without-parole sentences are meted out only to 'the rarest of juvenile offenders' whose crimes reflect 'permanent incorrigibility,' 'irreparable corruption' and 'irretrievable depravity,' as required by **Miller** and **Montgomery**." **Batts II**, at 416. As the procedures simply advanced the **Miller** concepts of juvenile sentencing, the Commonwealth submits, they affected only the manner in which the court determined sentence, and do not amount to a substantive rule.

Nor do the **Batts II** procedures reach "watershed status," argues the Commonwealth. This is hardly surprising, the Commonwealth continues, as the United States Supreme Court has effectively limited the class of cases establishing watershed rules to a class of one—**Gideon v. Wainwright**, 372

U.S. 335 (1963) (requiring the appointment of counsel to indigent defendants charged with felonies). *See Whorton v. Bockting*, 549 U.S. 406, 417-18 (2007) ("in the years since *Teague*, we have rejected every claim that a new rule satisfied the requirements for watershed status") (collecting cases).

Further undercutting Appellant's claim that *Batts II* announces a watershed procedural rule, the Commonwealth posits, is that *Miller* and *Montgomery* anticipated states would create procedural rules to implement *Miller*'s new substantive rule. It insists this is all the Pennsylvania Supreme Court did in its *Batts II* decision, as the Superior Court has since recognized. Appellee's brief at 28 (citing *Commonwealth v. Foust*, 180 A.3d 416, 429 (Pa.Super. 2018) ("After deciding the merits of Batts' appeal, our Supreme Court 'exercise[d its] constitutional power of judicial administration to devise a procedure for the implementation of the *Miller* and *Montgomery* decisions in Pennsylvania.'") (quoting *Batts II*).

Appellant first submits that *Batts II* expresses a substantive rule, as he claims it forbids imposition of a LWOP sentence upon a defined class of individuals, namely, those whom the Commonwealth cannot prove beyond a reasonable doubt are incapable of rehabilitation. In other words, he says *Batts II* protects a class of individuals from a discretionary LWOP sentence beyond the Commonwealth's authority. Appellant's brief at 29. We disagree.

It was *Miller*, not *Batts II*, that announced the relevant substantive rule requiring retroactive application when it held sentencing a juvenile to life without parole is excessive for all but "the rare juvenile offender whose crime

reflects irreparable corruption[.]" *Id.*, at 479-480. *See also Montgomery*, 136 S.Ct.. at 734 (recognizing *Miller* issued a new substantive rule requiring retroactive application to collateral appeals). Indeed, the Pennsylvania Supreme Court specifically announced it was providing with its *Batts II* decision a procedural overlay to *Miller* in order to advance implementation of *Miller*. As such, *Batts II* did not represent an extension of *Miller* by defining an additional class of juvenile offenders capable of rehabilitation and, thus, insulated from LWOP sentencing. Instead, it only developed procedures, rooted in *Miller*'s principal considerations of juvenile sentencing, that would optimize accurate identification of rehabilitable juveniles coming under *Miller*'s protection.

This conclusion aligns with the precept in *Schriro* and its progeny that whether a new rule is substantive or procedural is largely driven by a consideration of the function of the rule at issue, we discern that the new rule in *Batts II* may fairly be said to regulate only the procedures for determining a juvenile offender's capacity for rehabilitation. As such, the rule is procedural, not substantive. *See Welch*, 136 S.Ct. at 1265-66. For these reasons, we conclude *Batts II* announced no substantive rule qualifying for retroactive application to cases pending on collateral review.

Alternatively, Appellant argues, *Batts II* created a "watershed rule of criminal procedure requiring retroactive application." Appellant's brief at 33 (emphasis omitted). "Even if *Batts II* is deemed procedural, it satisfies *Teague*'s second exception as a "watershed rule[ ] of criminal procedure[,]"

Appellant posits, because the change is "necessary to prevent an impermissibly large risk" of inaccuracy in a criminal proceeding and also "alter[s] our understanding of the bedrock procedural elements essential to the fairness of a proceeding." Appellant's brief at 33 (acknowledging standard expressed in **Whorton**, 549 U.S. at 418 (internal quotations omitted)). Appellant also claims that "[t]he requirements under **Batts II** upend juvenile homicide sentencing hearings, recognizing the distinct nature of life without parole and protecting against such a sentence for a certain class of youth." Appellant's brief at 34.

We discern no "impermissibly large risk" of inaccuracy in LWOP proceedings when **Miller** repeatedly emphasized how rare it is for a juvenile's crime to reflect incorrigibility and admonished that a LWOP sentence should be an uncommon occurrence. [4] Clearly, the aim of the **Batts II** procedural

_____

[4] To our earlier discussion of such references in **Miller**, we add the following principled insights from the seminal decision that served as a template for the **Batts II** procedural scheme:

> "[G]iven all we have said in **Roper**, **Graham**, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in Roper and Graham of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the _rare_ juvenile offender whose crime reflects irreparable corruption." **Roper**, 543 U.S. at 573, 125 S.Ct. 1183; **Graham**, 560 U.S. at 68, 130 S.Ct., at 2026-2027. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children

scheme is to reduce misapplications of *Miller* in juvenile sentencing, and its specific requirements regarding presumptions and burdens are well-designed toward that end.

Yet, precedent teaches that "the chance of a more accurate outcome under the new procedure normally does not justify the cost of vacating a conviction whose only flaw is that its procedures 'conformed to then-existing constitutional standards.'" *Teague*, *supra*, at 310. In this regard, *Miller*'s standards, embracing as they did a clear repudiation of not only mandatory LWOP sentencing schemes but also the notion of commonplace discretionary LWOP sentences, did much to clarify how sentencing courts should view evidence of a juvenile's capacity to rehabilitate. While *Batts II* provides a delineation of procedures that aid in this evidentiary review, we stop short of

---

are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, at 479-480.

"'[o]nly a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior.'" *Miller* at 471 (at 570) (citation omitted).

"We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed'" *Miller*, at 570 (citation omitted).

Incorrigibility is inconsistent with youth. Life without the possibility of parole forswears altogether the rehabilitative ideal. It is "at odds with a child's capacity for change." *Miller*, at 473 (citation omitted).

declaring it to have altered our understanding of *Miller*'s bedrock elements informing a fair proceeding.

Indeed, in **Batts II**, our Pennsylvania Supreme Court distilled *Miller*'s essential observations—appropriate occasions for LWOP sentences will be *uncommon*; it will be the *rare* juvenile offender whose crime reflects irreparable corruption; and fundamental differences between children and adults *counsel against* LWOP sentences for juveniles—into a procedural scheme requiring sentencing courts to presume juveniles can rehabilitate and placing upon the Commonwealth the burden to prove otherwise beyond a reasonable doubt. To be sure, our Supreme Court acknowledged *Miller*'s pivotal role in the formulation of the **Batts II** presumption and burden of proof assignment where it noted "any suggestion of placing the burden on the juvenile offender is belied by the central premise of *Roper*, *Graham*, *Miller*, and **Montgomery**. . . ." **Batts II**, 163 A.3d at 452.

Such a scheme, therefore, represents the manifestation of *Miller*'s clear charge for mitigated sentencing with the opportunity for parole in the vast majority of juvenile cases.

Rather than including **Batts II** among the ranks of **Gideon**—the only decision recognized by the United States Supreme Court as issuing a watershed procedural rule—we understand **Batts II** as announcing a new rule that nevertheless rests largely on the **Miller** precedent. As such, **Batts II** provides a most salient directive regulating the manner in which sentencing courts are to implement *Miller*'s governing considerations.

We, therefore, decline to find **Batts II** established a watershed procedural rule necessitating retroactive application to collateral proceedings. Accordingly, Appellant's final challenge fails.

Order affirmed.

Judge Stabile has joined the Opinion.

Judge Strassburger files a Concurring/Dissenting Opinion.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/19/18