J-S13028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DUSTIN CAMERON NICHOLS | : | |
| | : | |
| Appellant | : | No. 951 WDA 2023 |

Appeal from the PCRA Order Entered July 21, 2023
In the Court of Common Pleas of Mercer County Criminal Division at
No(s): CP-43-CR-0000347-2017

BEFORE: KUNSELMAN, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BECK, J.: **FILED: SEPTEMBER 24, 2024**

Dustin Cameron Nichols ("Nichols") appeals from the order entered July 21, 2023, by the Mercer County Court of Common Pleas ("PCRA court") dismissing his first petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1] On appeal, Nichols raises claims of ineffective assistance of trial and direct appeal counsel. Because Nichols' claims are either meritless or waived, we affirm.

The record reflects that in the early morning of February 6, 2017, Nichols maimed a cat belonging to his roommate, Olivia Gonzalez ("Gonzalez"), with a glass bong and then killed Gonzalez by shooting her four times with a twelve-gauge shotgun inside the residence they shared. After

---

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

shooting her, Nichols struck Gonzalez in the head three times with the butt of the shotgun. Nichols called 9-1-1 later that morning, admitting in the call that he murdered Gonzalez. Nichols cooperated with police and participated, without counsel, in four separate recorded interviews that day.

The Commonwealth charged Nichols with first-degree murder, third-degree murder, and cruelty to animals.[2] At trial, Nichols admitted he killed Gonzalez, but argued that he was voluntarily intoxicated on lysergic acid diethylamide ("LSD") and marijuana and thus lacked the requisite criminal intent for first-degree murder.[3] The evidence at trial confirmed that Nichols and Gonzalez ingested both drugs before the killing. The primary issue before the jury was whether Nichols had a specific intent to kill Gonzalez; the parties presented conflicting expert testimony on this question.

Following a five-day trial, a jury found Nichols guilty of first-degree murder and cruelty to animals, and not guilty of third-degree murder. The trial court sentenced Nichols to a term of life imprisonment without the possibility of parole for first-degree murder and a concurrent term of four to twelve months of imprisonment for the cruelty to animals conviction. Nichols filed a post-sentence motion, which the trial court denied; this Court affirmed his judgment of sentence on December 10, 2019, and our Supreme Court

---

[2] 18 Pa.C.S. §§ 2502(a), 2502(c), 5511(a)(1)(i) (repealed by Act of June 28, 2017, P.L. 215, No. 10, § 3). Crimes and offenses relating to cruelty to animals are now found at 18 Pa.C.S. §§ 5531-5561.

[3] **See** 18 Pa.C.S. § 308.

denied his petition for allowance of appeal on June 1, 2020. ***Commonwealth v. Nichols***, 1815 WDA 2018, 2019 WL 6716179 (Pa. Super. Dec. 10, 2019) (non-precedential decision), *appeal denied*, 235 A.3d 270 (Pa. 2020).

On March 7, 2022, Nichols filed a counseled PCRA petition, his first, and on August 5, 2022, counsel filed an amended petition. Therein, Nichols asserted his petition satisfied an exception to the PCRA's time-bar and raised claims of ineffective assistance of trial and direct appeal counsel. Following an evidentiary hearing limited to the issue of the timeliness of the petition, the PCRA court dismissed it as untimely filed. Nichols appealed and this Court reversed, holding that Nichols satisfied the newly-discovered facts exception[4] to the PCRA's time-bar because direct appeal counsel abandoned him after filing his petition for allowance of appeal to our Supreme Court, failed to notify Nichols when the petition was denied, and Nichols exercised due diligence in discovering direct appeal counsel's ineffectiveness and pursuing his claims. ***Commonwealth v. Nichols***, 1287 WDA 2022, 2023 WL 3839552, at *4-5 (Pa. Super. June 6, 2023) (non-precedential decision). Following remand, the PCRA court dismissed the amended petition without a hearing on July 21, 2023, and denied Nichols' motion for reconsideration on August 14, 2023. This timely-filed appeal followed. The PCRA court and Nichols complied with

---

[4] ***See*** 42 Pa.C.S. § 9545(b)(1)(ii).

the requirements of Rule 1925 of our Pennsylvania Rules of Appellate Procedure.[5]

On appeal, Nichols presents seven questions for our consideration:

1. Did the [PCRA c]ourt err in failing to conduct a hearing on [Nichols'] Amended Petition under the [PCRA] foreclosing [Nichols'] ability to argue the legal and factual basis for [Nichols'] allegation of error and ineffective assistance of counsel?

2. Did the [PCRA c]ourt err in dismissing [Nichols'] claim of ineffectiveness of [direct appeal] counsel in failing to raise the issue of intoxication being a factor in determining [Nichols'] requisite intent to kill?

3. Did the [PCRA c]ourt err in dismissing [Nichols'] claim of ineffectiveness of trial counsel in failing to request an instruction for adverse inference or object to the absence of an adverse inference instruction?

4. Did the [PCRA c]ourt err in dismissing [Nichols'] claim of ineffectiveness of [direct appeal] counsel in raising only a single issue on appeal that had been waived by trial counsel?

5. Did the [trial c]ourt err in admonishing the jury that if they did not reach a verdict they would be required to stay overnight in a hotel and eat pizza from a local shop entitling [Nichols] to a new trial?

6. Did the [PCRA c]ourt err in dismissing [Nichols'] claim of ineffectiveness of trial counsel in failing to object to the [PCRA c]ourt's admonishment?

7. Did the [trial c]ourt err in admitting inflammatory photographs of the victim and crime scene without an objection from trial counsel regarding an off-the record analysis of admissibility?

_____

[5] In its Rule 1925(a) opinion, the PCRA court directed us to its opinion and order filed on July 21, 2023, which set forth the reasons for its dismissal of Nichols' amended PCRA petition. *See* Rule 1925(a) Opinion, 10/25/2023.

Nichols' Brief at 11-12 (suggested answers omitted; reordered for ease of disposition).

> Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party. With respect to the PCRA court's decision to deny a request for an evidentiary hearing, or to hold a limited evidentiary hearing, such a decision is within the discretion of the PCRA court and will not be overturned absent an abuse of discretion.

*Commonwealth v. Wilson*, 273 A.3d 13, 18 (Pa. Super. 2022) (citations omitted).

"A petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact and the petitioner is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings." *Commonwealth v. Williams*, 313 A.3d 249, 253 (Pa. Super. 2024) (citations, quotation marks, and brackets omitted); *see also* Pa.R.Crim.P. 907(1). "A reviewing court on appeal must examine each of the issues raised in the PCRA petition in light of the record in order to determine whether the PCRA court erred in concluding that there were no genuine issues of material fact and in denying relief without an evidentiary hearing." *Williams*, 313 A.3d at 253 (citations and quotation marks omitted).

Nichols raises several layered claims of ineffective assistance of direct appeal and trial counsel. "In considering an ineffective assistance of counsel

claim, we observe first that counsel is presumed effective and that a petitioner bears the burden to prove otherwise." ***Commonwealth v. Hamilton***, 303 A.3d 823, 830-31 (Pa. Super. 2023) (citation omitted). To establish an ineffectiveness claim, a petitioner must prove:

> (1) The underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) appellant suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.

***Id.*** at 831 (citation, quotation marks, and brackets omitted). "Failure to prove any prong of this test will defeat an ineffectiveness claim. When an appellant fails to meaningfully discuss each of the three ineffectiveness prongs, he is not entitled to relief, and we are constrained to find such claims waived for lack of development." ***Id.*** (citation and quotation marks omitted).

Further, "[w]here the defendant asserts a layered ineffectiveness claim he must properly argue each prong of the three-prong ineffectiveness test for each separate attorney." ***Commonwealth v. Gibson***, ___ A.3d ___, 2024 WL 3263496, at * 4 (Pa. Super. July 2, 2024).

> Layered claims of ineffectiveness are not wholly distinct from the underlying claims, because proof of the underlying claim is an essential element of the derivative ineffectiveness claim. In determining a layered claim of ineffectiveness, the critical inquiry is whether the first attorney that the defendant asserts was ineffective did, in fact, render ineffective assistance of counsel. If that attorney was effective, then subsequent counsel cannot be deemed ineffective for failing to raise the underlying issue.
>
> In any event, it is well settled that counsel cannot be deemed ineffective for failing to raise a meritless claim.

- 6 -

*Id.* (citations and quotation marks omitted).

In his first issue, Nichols argues that the PCRA court should have held a hearing on the issues raised in his amended PCRA petition. Nichols' Brief at 19-29. Because this issue is subsumed under other issues Nichols raises on appeal, we do not address it separately. However, we note that in the argument section for this first issue, Nichols correctly points out that the PCRA court failed to issue the requisite notice of its intent to dismiss his amended PCRA petition without a hearing pursuant to Rule 907(1) of the Pennsylvania Rules of Criminal Procedure. *Id.* at 28. Nichols argues that this omission denied him the opportunity to object or amend his petition. *Id.* at 29.

"A PCRA court's compliance with Rule 907 is mandatory." *Commonwealth v. Wooden*, 215 A.3d 997, 1001 (Pa. Super. 2019) (citation omitted). However, "an appellant's failure to challenge the absence of a Rule 907 notice constitutes waiver." *Id.* (citation omitted). Nichols failed to raise this issue in his motion for reconsideration or Rule 1925(b) concise statement of errors, and therefore, it is waived. *See id.*; *see also* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

In his second issue, Nichols argues the ineffectiveness of direct appeal counsel in failing to raise the issue of whether the Commonwealth disproved

beyond a reasonable doubt his voluntary intoxication defense.[6]  Nichols' Brief at 29-35.  He points to the testimony of City of Hermitage Detective Derek Songer regarding what Nichols said during his police interviews about his state of mind at the time of the killing; two Commonwealth expert witnesses, Eric Vey, M.D., a forensic pathologist, and Ayako Chan-Hosokawa, a forensic toxicologist; and defense expert witness, Alice Applegate, Ph.D., a psychologist.  *See id.* at 31-35.  Specifically, he argues that the evidence showed that (1) Detective Songer agreed at trial that he never got Nichols to admit that the shooting was premeditated; (2) Nichols consistently told police during his interviews that he was not conscious of his actions; (3) the quantities of LSD and cannabis found in Gonzalez's and Nichols' blood were consistent with the usage reported by Nichols; (4) LSD usage can produce acute panic attacks and psychotic reactions; (5) Nichols had no rational motive to kill Gonzalez; and (6) certain precursors to the shooting (i.e., Nichols'

_____

[6] We note that in his amended PCRA petition, Nichols refers in two instances to his "involuntary intoxication."  *Compare* Amended PCRA Petition, 8/5/2022, ¶¶ 33, 38 (stating he was involuntarily intoxicated) *with id.* ¶¶ 26, 28, 39 (stating he was voluntarily intoxicated).  In its opinion, the PCRA court addressed the issue of involuntary intoxication, concluding that Nichols failed to support such a claim with any argument and, even if he had, it would not result in relief.  *See* PCRA Court Opinion, 7/21/2023, at 1-2.  Based upon our review of the record, including the notes of trial testimony and two jury instructions on the defense of voluntary intoxication, we discern that Nichols mistakenly included the phrase involuntary intoxication when he intended to include voluntary intoxication.  We further note that both the Commonwealth and defense counsel made the same (presumably inadvertent) mistake during trial.  N.T., 10/19/2018 (Jury Trial Day 5), at 53; N.T., 10/18/2018 (Jury Trial Day 4, Afternoon Session), at 109.

- 8 -

mental and medical illnesses, his intense paranoia caused by a home invasion robbery of his handgun the week before Gonzalez's death, and the effects of LSD and cannabis causing confusion) resulted in Nichols having "no cognitive, behavioral[,] or volitional control over his paranoid, bizarre, aggressive, dissociative, homicidal behavior during the shooting of [Gonzalez]." *Id.* Based on the foregoing, Nichols contends there was insufficient evidence to disprove his voluntary intoxication defense and direct appeal counsel was therefore ineffective in failing to raise the issue on direct appeal. *Id.* at 29-25.

> When reviewing the sufficiency of the evidence for first degree murder, we are obliged to determine whether the evidence presented at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to satisfy all elements of the offense beyond a reasonable doubt.

*Commonwealth v. Spell*, 28 A.3d 1274, 1278 (Pa. 2011) (citations and quotation marks omitted).

"A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S. § 2502(a). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). "To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill." *Spell*, 28 A.3d at 1278 (citations and quotation marks omitted).

"The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body." ***Commonwealth v. Brown***, 987 A.2d 699, 705 (Pa. 2009).

In Pennsylvania, voluntary intoxication is not a defense except in cases of murder, where a defendant may offer evidence of such intoxication if it is "relevant to reduce murder from a higher degree to a lower degree of murder." 18 Pa.C.S. § 308; ***see also Commonwealth v. Stahley***, 201 A.3d 200, 212 (Pa. Super. 2018). "Thus, a defendant asserting a diminished capacity defense admits responsibility for the underlying action, but contests the degree of culpability based upon his inability to formulate the requisite mental state." ***Stahley***, 201 A.3d at 212 (citation and internal quotation marks omitted). To succeed on a voluntary intoxication defense, "the evidence presented at trial must show that the defendant was unable to form the specific intent to kill because he was so overwhelmed or overpowered by drugs to the point of losing his faculties at the time the crime was committed." ***Commonwealth v. Fletcher***, 861 A.2d 898, 908 (Pa. 2004) (citation omitted). "[W]hether a defendant's faculties and sensibilities were so overwhelmed with drugs so that he could not form the specific intent to kill is a question of fact solely within the province of the jury, who is free to believe any, all, or none of the testimony regarding intoxication." ***Id.***

Following our review of the record, we conclude Nichols' underlying claim lacks arguable merit. The record reflects that the first two elements of first-degree murder are undisputed: Gonzalez was unlawfully killed and Nichols was the one who killed her. As to the third element, the Commonwealth presented sufficient evidence of Nichols' specific intent to kill Gonzalez. Nichols fired five rounds of a shotgun at Gonzalez and struck her body four times: once in her forearm, twice in her back, and once in her head. N.T., 10/16/2018 (Jury Trial Day 2), at 79, 88-89, 94, 109, 120; N.T., 10/17/2018 (Jury Trial Day 3), at 47, 49; N.T., 10/18/2018 (Jury Trial Day 4, Afternoon Session), at 165. The evidence also showed that Nichols shot Gonzalez in close proximity and that he was "going in a line" as he was moving toward her, "climbing over a couch, literally going up over the couch" and ending up beside Gonzalez and "firing down into her head." N.T., 10/16/2018 (Jury Trial Day 2), at 43, 115-16, 118, 122; N.T., 10/18/2018 (Jury Trial Day 4, Morning Session), at 14. He used a twelve-gauge pump-action shotgun, which meant he had to work the pump slide after firing each round. N.T., 10/16/2018 (Jury Trial Day 2), at 30, 43, 73, 117; N.T., 10/17/2018 (Jury Trial Day 3), at 82. After shooting her, Nichols also admitted to hitting Gonzalez in the head three times with the butt of the shotgun to make sure she was dead. N.T., 10/16/2018 (Jury Trial Day 2), at 71-74; N.T., 10/17/2018 (Jury Trial Day 3), at 50-51, 61, 106; N.T., 10/18/2018 (Jury Trial Day 4, Morning Session), at 3-4, 15, 48. This evidence is enough to

support the specific intent to kill necessary for a first-degree murder conviction. **See Brown**, 987 A.2d at 705.

As to Nichols' claim that his conviction should be for third-degree murder because he was intoxicated, the evidence at trial confirmed the presence of LSD and marijuana in both Nichols' blood and Gonzalez's post-mortem blood. N.T., 10/17/2018 (Jury Trial Day 3), at 33; N.T., 10/18/2018 (Jury Trial Day 4, Morning Session), at 52-75. Nichols presented his voluntary intoxication defense through cross examination of the Commonwealth's witnesses and his own expert witness, Dr. Applegate. The Commonwealth, in rebuttal, presented an expert witness, Bruce Wright, M.D., to refute Nichols' defense of intoxication.

With respect to Nichols' state of mind, Detective Songer testified that Nichols reported to him during his interviews the day of the killing: "I felt my mind slipping"; "Mentally, it was not me"; "Something took hold of me. It was something I never experienced before. What I did there, I did that. It wasn't me that did that, but it was me that did that"; and "I had a moment come into my eyes. I cried, felt like I was dying, and I was in a repetitive game and at the end I was going to heaven or hell. It wasn't me who did it, but it was me who did it." N.T., 10/16/2018 (Jury Trial Day 2), at 30, 34-35, 45, 46, 48.

Dr. Applegate testified that she believed Nichols could not form the specific intent to kill. **See** N.T., 10/18/2018 (Jury Trial Day 4, Afternoon Session), at 10-108. She opined that Nichols experienced a "good LSD trip;

then he had a bad LSD trip; and then he went into a state of extreme delirium." *Id.* at 23. She concluded that Nichols did not premeditate the killing and "he had no cognitive[,] behavioral, or volitional control over his actions during that extreme delirium." *Id.* at 28; *see also id.* at 47-48, 75. Dr. Applegate believed that several factors "synergistically worked together for [Nichols] to fall into that state of excited delirium." *Id.* at 34. These factors included Nichols' mental illness[7] and mental health history, medical illness,[8] sleep deprivation,[9] and "situational acute paranoia" from a home invasion that occurred the week before the killing.[10] *Id.* at 32-33. Dr. Applegate conceded that "you can be psychotic and plan" and that Nichols "did go get the gun and he did point it at [Gonzalez] and then he bashed her" with

_____

[7] Dr. Applegate evaluated Nichols and diagnosed him with numerous mental health conditions. N.T., 10/18/2018 (Jury Trial Day 4, Afternoon Session), at 28-29.

[8] Dr. Applegate testified that two days before the murder, Nichols sought medical treatment for blood in his urine and was diagnosed with a urinary tract infection, which she testified is associated with the side effect of psychosis. N.T., 10/18/2018 (Jury Trial Day 4, Afternoon Session), at 33-34.

[9] Nichols reported to police that he and Gonzalez "binge" watched the vampire show True Blood from about 6:00 p.m. on Sunday, February 5, 2017 until about sunrise on Monday, February 6, 2017. N.T., 10/18/2018 (Jury Trial Day 4, Morning Session), at 8.

[10] The Commonwealth presented the testimony of Wesley Van Pelt ("Van Pelt"), who admitted to his involvement in a robbery of Nichols' handgun at Nichols' home on January 31, 2017, in exchange for immunity for his testimony at Nichols' trial and from future prosecution, unless Van Pelt did not testify truthfully. N.T., 10/16/2018 (Jury Trial Day 2), at 97-102, 146-72.

the butt of the gun. *Id.* at 62-63. She also agreed that "other branches of medicine" do not find "excited delirium" to be a "legitimate area of diagnosis." *Id.* at 92.

On the other hand, the Commonwealth's expert, Dr. Wright, opined that, "[d]espite the fact that [Nichols] had ingested LSD and marijuana, despite his history of psychiatric problems, at the time of this offense[,] he had the capacity to form the intent to kill and to be conscious of his actions" and Nichols made "an informed and deliberate decision" to kill Gonzalez. *Id.* at 118, 126; *see also id.* at 129. He concluded that even though Nichols experienced psychotic symptoms and "perceptual disturbances at some point during the night" consistent with "LSD and/or marijuana intoxication," Nichols "carried out very deliberate acts when he shot [] Gonzalez." *Id.* at 125-26, 160. Dr. Wright explained:

> Dr. Applegate said [Nichols] had no control over his thoughts or behavior. In contrast, in reading the police records, [Nichols] went from the living room to the bedroom, retrieved the gun, he went back to the living room. Nichols said at one point he got up on the couch, he shouldered the weapon. I'm not a gun person, but it's my understanding you have to unlock it and then pump it and then pull the trigger. He did that multiple times in the direction of [Gonzalez], as he said. Then after he did that, [Nichols] went towards her. I guess the last shot was very close to her. But after he shot her the last time, he then hit her in the head three times to make sure she was dead. It's my opinion that unequivocally shows that [Nichols] had the capacity to complete pre-deliberate and premeditated acts.

*Id.* at 128; *see also id.* at 164-65. Dr. Wright testified that if Nichols did not have the specific intent to kill Gonzalez, then

- 14 -

[i]t would not look like the goal-directed activity that [] we saw. This was very goal-directed activity: retrieving the weapon, pointing it at her. It would have been more random[,] disorganized activity, shooting anywhere, or hitting the butt stock against the wall or something like that. It would not have been directed towards [] Gonzalez.

*Id.* at 165. Dr. Wright testified that even though Nichols "could have still been delusional" at the time of the shooting, "that doesn't bear on his capacity to form the intent to kill. You can be delusional and have the capacity to form the intent to kill." *Id.* at 154; *see also id.* at 161, 166 (Dr. Wright testifying, "we all agree that [Nichols] was intoxicated on something and that he had some type of psychiatric illness. You can be intoxicated, you can have a psychiatric illness and still have the capacity to form the intent to kill").

Based on the foregoing, we conclude the evidence was sufficient to sustain Nichols' first-degree murder conviction. The question of whether Nichols' faculties and sensibilities were so overwhelmed with LSD and marijuana that he could not form the specific intent to kill Gonzalez was solely for the jury to decide; the jurors were free to believe any, all, or none of the evidence regarding how, if at all, his intoxication impacted his ability to form the intent to kill. *See Fletcher*, 861 A.2d at 908; *see also Commonwealth v. Cessna*, 537 A.2d 834 (Pa. Super. 1988) (holding evidence was sufficient for factfinder to conclude that Cessna fired a rifle at victim's head with specific intent to kill to sustain first-degree murder conviction despite Cessna's claimed LSD ingestion). Because there is no arguable merit to Nichols' underlying claim, direct appeal counsel cannot be deemed ineffective for

failing to raise it on appeal. ***See Gibson***, \_\_\_ A.3d \_\_\_, 2024 WL 3263496, at \* 4. Accordingly, Nichols' second issue fails.

In his third issue, Nichols argues that trial counsel was ineffective for failing to request a no-adverse-inference jury instruction, or object to its absence, after Nichols exercised his right not to testify at trial. Nichols' Brief at 38-40.[11] Nichols contends trial counsel's failure violated his constitutional rights and prejudiced him by creating "the appearance for the jury that the mere fact that [he] didn't testify could be used as an indication of guilt." ***Id.*** at 40.

"A no-adverse-inference instruction directs the jurors that they may not draw any derogatory insinuation from a defendant's failure to testify on his own defense, because the defendant has the unqualified right not to take the stand if he so chooses." ***Commonwealth v. Perez***, 103 A.3d 344, 348 (Pa. Super. 2014) (citation omitted). A criminal defendant is entitled to a no-adverse-inference jury instruction under both the Pennsylvania and United States Constitutions. ***Id.*** (citing ***Commonwealth v. Lewis***, 598 A.2d 975, 979 (Pa. 1991)). Our Supreme Court has held that the trial court must give the no-adverse-inference instruction unless the defendant expressly waives

---

[11] While Nichols refers to an "adverse inference" instruction in his concise statement of errors and the statement of questions presented section of his brief, we discern from our review of the record and the argument raised that he meant to state a "no-adverse-inference" instruction. ***See*** Rule 1925(b) Statement, 10/24/2023, ¶ VII; Nichols' Brief at 11, 38-40.

his right to the instruction in an on-the-record colloquy. ***Commonwealth v. Thompson***, 674 A.2d 217, 222 (Pa. 1996). When trial counsel fails to conduct such a colloquy, the standard three-part ineffectiveness-of-counsel test governs the ineffectiveness analysis. ***Commonwealth v. Stanley***, 830 A.2d 1021, 1027 (Pa. Super. 2003).

Our review of the record reveals that trial counsel ostensibly requested a no-adverse-inference instruction after Nichols declined to testify and counsel read him an on-the-record colloquy. The relevant portion of the colloquy stated: "You have a Fifth Amendment privilege that's afforded to everybody that says you cannot be compelled to testify and the jury will be instructed that that's not evidence of any type of guilt." N.T., 10/18/2018 (Jury Trial Day 4, Afternoon Session), at 110-11.[12] However, trial counsel failed to object to its absence in the trial court's jury instructions. After the trial court charged the jury, it asked the assistant district attorney and defense counsel, "[a]ny additions or corrections to the charge?" N.T., 10/19/2018 (Jury Trial Day 5),

---

[12] In addition, during closing arguments, trial counsel explained that Nichols did not testify because his testimony would have been cumulative to evidence of his recorded statements with police, and stated:

> There is going to be an instruction and you have already gone through the jury selection process, but the fact that [Nichols] didn't testify is no evidence of his guilt, and you cannot hold it against him because I made a decision not to have him testify and offer cumulative evidence. You will receive a jury instruction for that.

N.T., 10/19/2018 (Jury Trial Day 5), at 26-27.

- 17 -

at 94. Both attorneys responded in the negative. *Id.* Direct appeal counsel raised the failure to issue the jury instruction on direct appeal, and this Court found it waived because trial counsel failed to preserve it. *Nichols*, 2019 WL 6716179, at *1.

The record further reflects that Nichols did not expressly waive his right to a no-adverse-inference instruction and, as such, trial counsel's failure to object to its omission by the trial court satisfies the arguable merit prong of the ineffectiveness test. *See Perez*, 103 A.2d at 350 (finding arguable merit in Perez's underlying claim that trial counsel was ineffective because he failed to object to the trial court's omission of a no-adverse-inference instruction in its charge to the jury). We nonetheless conclude that Nichols is not entitled to relief. In his brief before this Court, Nichols fails to make any argument whatsoever as to the second prong of the ineffectiveness test—in fact, he does not include any claim that trial counsel had no reasonable basis for failing to object to the absence of the instruction. Even if we were to overlook this omission, Nichols likewise fails to make any argument as to the third prong in support of his bald claim of prejudice. The extent of Nichols' discussion of prejudice is as follows: "The failure of trial counsel to ensure the no-adverse-inference instruction was given is ineffective assistance of counsel, prejudicial to [Nichols] and created the appearance for the jury that the mere fact [Nichols] didn't testify could be used as indication of guilt." Nichols' Brief at 40.

Moreover, Nichols couches his claim of prejudice in terms of allowing his failure to testify to be considered by the jury as an "indication of guilt." ***Id.*** This case did not involve a question of whether Nichols was guilty of killing Gonzalez. Defense counsel conceded Nichols' guilt in both his opening and closing statements. N.T., 10/15/2018 (Jury Trial Day 1), at 11 (Defense counsel stating: "We fully admit that [Nichols] caused the death of [] Gonzalez. There is no dispute about that. The sole issue for you to decide in listening to this case is what [Nichols'] state of mind was at the time he committed these acts."); N.T., 10/19/2018 (Jury Trial Day 5), at 8 (same). Similarly, the jury listened to Nichols' recorded statements with police and the testimony of those who interviewed him, wherein Nichols admitted to murdering Gonzalez and maiming her cat. While Nichols argued that his voluntary intoxication required a conviction of a lesser degree of murder, he never claimed he was innocent. In light of Nichols' concession of guilt, even if a no-adverse-inference instruction was given, there is no reasonable probability that the instruction in anyway would have found him not guilty as he now tacitly suggests. ***See Perez***, 103 A.3d at 351-52 (holding, where trial counsel failed to object to the trial court's omission of a no-adverse-inference instruction, Perez failed to establish the prejudice prong of the ineffectiveness-of-counsel test because, where there was compelling evidence of his guilt, "even if a no-adverse-inference instruction was given, there was no realistic likelihood that the jury would have reached a not guilty verdict").

Because Nichols did not discuss the second prong whatsoever and failed to meaningfully discuss the prejudice prong, this claim fails. *See Hamilton*, 303 A.3d 823, 831.

Relatedly, in his fourth issue, Nichols argues direct appeal counsel's ineffectiveness for raising only one issue on direct appeal: that the trial court committed reversible error when it did not provide the jury a no-adverse-inference jury instruction. Nichols' Brief at 35-38. He contends that direct appeal counsel should have raised, on direct appeal, trial counsel's ineffectiveness for failure to preserve this issue. *Id.*

This issue, however, is meritless because claims of ineffective assistance of counsel generally must be deferred to PCRA review. *See Commonwealth v. Holmes*, 79 A.3d 562, 576 (Pa. 2013) (footnote omitted) (holding that, subject to limited exceptions, "claims of ineffective assistance of counsel are to be deferred to PCRA review; trial courts should not entertain claims of ineffectiveness upon post-verdict motions; and such claims should not be reviewed upon direct appeal"). Nichols has not identified, let alone discussed, any exceptions to this general rule or how his circumstances would have warranted review of trial counsel's effectiveness on direct appeal. To the contrary, on direct appeal, this Court specifically stated that "the issue of trial counsel's ineffectiveness is not before us, nor could it be at this stage of proceedings." *Nichols*, 2019 WL 6716179, at *1 n.5 (citing *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002) (holding that generally, defendants should

wait to raise claims of ineffective assistance of trial counsel until collateral review)). Accordingly, Nichols' claim that direct appeal counsel should have raised trial counsel's effectiveness on direct appeal is without merit.

In Nichols' fifth issue, he claims that the trial court's remarks to the jury about eating pizza for dinner and staying overnight in a hotel if they did not reach a verdict were prejudicial. Nichols' Brief at 40-44. This is a claim of trial court error that could have been raised on direct appeal, but was not. Therefore, the issue is waived under the PCRA. **See** 42 Pa.C.S. § 9544(b) (stating that an issue is waived for the purpose of the PCRA "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding"); **see also Commonwealth v. Bond**, 819 A.2d 33, 40 (Pa. 2002).

Relatedly, in Nichols' sixth issue, he argues that trial counsel was ineffective for not objecting to the trial court's remarks to the jury about pizza and a hotel. Nichols' Brief at 44-46. He contends trial counsel should have objected, or requested a mistrial or curative instruction because the trial court mentioned sequestration for the first time while the jurors were deliberating, taking them by surprise. **Id.** at 44. According to Nichols, this put undue pressure on the jury to render a verdict before the evening break or face sequestration. **Id.** at 45-46. He also argues that the remarks may have influenced a single juror who "would have to deal with the ire of the other jurors for not agreeing on a verdict and causing overnight sequestration." **Id.**

at 46. Nichols contends trial counsel had no strategic basis for not preserving the issue for appeal and that he was prejudiced, requiring a new trial or remand for an evidentiary hearing. *Id.*

The trial transcript indicates that at the end of closing arguments, the trial court addressed the jury in part by saying:

> While we are waiting, I want to make sure you understand, **don't be in a rush.** We will take care of dinner for you. There is a gourmet restaurant here in Mercer called Pizza Joe[']s. You will not go hungry.

N.T., 10/19/2018 (Jury Trial Day 5), at 96 (emphasis added). Immediately thereafter, the jury began its deliberations at 2:05 p.m. It reconvened for two questions at 2:55 p.m. *Id.* After the trial court addressed both questions,[13] which spanned more than three pages of trial transcript, the trial court stated:

> I am going to tell you this right now, because the Court Administrator was talking to me about it. **Don't rush and don't make a decision based on this.** For first[-d]egree [m]urder trials if you cannot deliberate and come to a verdict by nighttime, we have to put you up in a hotel. None of you have clothing with you. So we might allow you to go home if this happens and get a change of clothing. But you will have to report to the hotel down the road. That's a standard operating procedure. Okay? With that, then you will go to bed with Pizza Joe's in your stomach.
>
> Please continue your deliberations.

_____

[13] The jury asked whether it should list a verdict for both first- and third-degree murder and for a definition of "conscious decision" and "deliberate decision." *Id.* at 97.

*Id.* at 100 (emphasis added). The jury continued to deliberate for another 49 minutes, from 3:03 p.m. until 3:52 p.m., when it reconvened for a question on the legal definition of first- and third-degree murder. *Id.* at 100-01. After the trial court answered, the jury continued its deliberations for another thirty minutes, from 3:59 p.m. to 4:29 p.m., before reaching its verdict. *Id.* at 104.

Our Supreme Court has stated:

Every unwise or irrelevant remark made in the course of the trial by a judge, does not compel the granting of a new trial. A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.

*Commonwealth v. Goosby*, 301 A.2d 673, 674 (Pa. 1973) (citations and quotation marks omitted). Further, "[t]he jury is presumed to have followed the court's instructions." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1147 (Pa. 2011) (citation and quotation marks omitted).

Here, the trial court provided information to jurors who likely wondered about such practical matters in the event they could not reach a verdict during regular court hours. The trial court specifically instructed the jury not to allow its statement about a hotel and pizza to influence its decision and, on two separate occasions, not to rush. As the record reflects, after the trial court's remarks, the jury did not leave and immediately render a verdict; rather, it deliberated and asked questions over the course of two hours and twenty-four minutes. There is no indication in the record that the nature and delivery of the trial court's statements deprived Nichols of a fair and impartial trial and

we presume the jury followed its instructions not to be influenced thereby or hastened in its decision. **See Goosby**, 301 A.2d at 674; **Chmiel**, 30 A.3d at 1147. Because the underlying claim lacks arguable merit, trial counsel cannot be deemed ineffective for failing to object or request mistrial or curative instruction. **See Hamilton**, 303 A.3d at 831.

In his seventh and final issue, Nichols argues that the trial court erred because it never conducted an on-the-record analysis as to why it admitted photographs of Gonzalez at the crime scene. Nichols' Brief at 47-48. He then goes on to assert, without discussion, that trial counsel was ineffective for failing to object to the trial court's off-the-record explanation for its admission of the photographs, and direct appeal counsel's ineffectiveness for failing "to raise the issue of trial counsel's ineffectiveness on this issue." **Id.** at 48.

This claim is waived on several bases. First, Nichols did not raise the argument in his amended PCRA petition. Rather, Nichols asserted: "The Public Defender should have raised the issue of publication to the jury of inflammatory, prejudicial photographs of the victim preserved for appeal by trial counsel." Amended Petition, 8/5/2022, ¶ 44. Nichols' failure to raise the claim he briefed in his petition results in its waiver. **See** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); **see also Commonwealth v. Paddy**, 15 A.3d 431, 446 (Pa. 2011) (stating that "[f]ailure to raise an issue before the PCRA court results in waiver") (citation omitted). Second, Nichols did not raise the claim

in his concise statement of errors. **See** Rule 1925(b) Statement, 10/24/2023, ¶ VIII ("Did the Court err in admitting inflammatory photographs of the victim and crime scene?"); **see also** Pa.R.A.P. 1925(b)(4)(vii); **Bonnett**, 239 A.3d at 1106. Lastly, Nichols' claim, at least in part, asserts trial court error that could have been raised on direct appeal; accordingly, it is waived on that basis as well. **See** 42 Pa.C.S. § 9544(b); **Bond**, 819 A.2d at 40.

Based upon the foregoing, we conclude the PCRA court did not err in dismissing Nichols' amended PCRA petition without a hearing. **See Williams**, 313 A.3d at 253.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 9/24/2024